Otto J. BINKER, Lieutenant; Charles Leo McBreen, Trooper;

Equal Employment Opportunity Commission and Lieutenant Otto J. Binker

v.

COMMONWEALTH OF PENNSYLVANIA; Pennsylvania State Police; Daniel F. Dunn, Commissioner of the Pennsylvania State Police,

George K. McCloskey, Objector, Appellant in 91–5745.

Otto J. BINKER, Lieutenant; Charles Leo McBreen, Trooper;

Equal Employment Opportunity Commission and Lieutenant Otto J. Binker

v.

COMMONWEALTH OF PENNSYLVANIA; Pennsylvania State Police; Daniel F. Dunn, Commissioner of the Pennsylvania State Police,

Majors George Evan; Roy L. Titler, Claimants, Appellants in 91–5746 and 91–5942.

Nos. 91–5745, 91–5746 and 91–5942.

United States Court of Appeals, Third Circuit.

Argued April 3, 1992.
Decided Sept. 22, 1992.

---

Donald R. Livingston, Gen. Counsel, Gwendolyn Young Reams, Associate Gen. Counsel, Lorraine C. Davis, Asst. Gen. Counsel, Paul D. Ramshaw, (argued), Estelle D. Franklin, Office of Gen. Counsel, Appellate Services, U.S. E.E.O.C., Washington, D.C., for appellee E.E.O.C.

Joseph S. Rengert (argued), Chief Counsel, Pennsylvania State Police, Harrisburg, Pa., for appellees Com. of Pa., Pennsylvania State Police and Dunn.

William P. Weichler (argued), Philip B. Friedman, Ambrose & Friedman, Erie, Pa., for appellant McCloskey.

Victor P. Stabile (argued), Dilworth, Paxson, Kalish & Kauffman, Harrisburg, Pa., for appellants Evan and Titler.

Before: BECKER, COWEN and ROTH, Circuit Judges.

## OPINION OF THE COURT

ROTH, Circuit Judge:

This appeal requires us to assess the provisions of a settlement agreement designed to make whole a class of police officers forced into early retirement in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. §§ 621 *et seq.* The appeal also forces us to address the circumstances under which an individual may challenge a settlement agreement negotiated on his behalf by the Equal Employment Opportunity Commission ("EEOC"). Using their individual awards as test cases, appellants George K. McCloskey, George Evan and Roy L. Titler challenge the overall fairness of an agreement EEOC negotiated with their employer, appellee Pennsylvania State Police ("PSP"), on behalf of the class of officers affected by the policy. The district court approved the settlement agreement. We will affirm.

### I.

Pennsylvania law requires all state police officers to retire at age 60. 71 P.S. § 65(d) (1990). In March 1983, Otto J. Binker challenged this policy as his mandatory retirement neared, alleging that the requirement violated both the ADEA and the Equal Protection Clause of the Fourteenth Amendment. Binker named as defendants PSP, its Commissioner, and the Commonwealth of Pennsylvania. EEOC, which declined to represent Binker, eventually initiated a separate suit against the same defendants on behalf of all other adversely-affected PSP officers. The two actions were consolidated in May 1983.

PSP defended the age limitation as a measure necessary to ensure that an officer was able to perform his physical duties. The district court initially agreed, finding that substantially all PSP officers over age 60 could not efficiently perform the physi-

cal requirements of the job. In 1987, however, on this case's second trip to this court,[1] the issue of liability was resolved in favor of the officers. In vacating the order of the district court which denied EEOC's motion for injunctive relief, we concluded that the record did not establish age as a bona fide occupational qualification reasonably necessary to the position of state police officer in Pennsylvania. 'In reaching this conclusion, the panel found it significant that at the time of the suit PSP employees were not required to meet minimum standards of health and physical fitness. *EEOC v. Pennsylvania*, 829 F.2d 392, 395 (3d Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1109, 99 L.Ed.2d 271 (1988).[2]

Rather than litigate the issue of damages, the parties decided to settle. After several years of negotiations, EEOC reached an agreement with PSP, awarding over $2.6 million to 83 former police employees.[3]

At the beginning of the negotiation process, each potential participant was asked to fill out a questionnaire supplying the reason for his[4] early retirement. EEOC determined that officers who voluntarily retired before turning 60 were ineligible to participate in the settlement.

Three men, including appellant McCloskey, objected to their exclusion from the settlement because EEOC determined that they had retired voluntarily before age 60.[5] McCloskey retired on July 29, 1981, approximately four months before his sixtieth birthday. In the EEOC questionnaire, he stated that his retirement was "involuntary." At two spots in the questionnaire he noted that his decision to retire was "mandatory." In giving the "reasons for retiring when [he] did," he referred as well to accumulated personal leave and sick time.

EEOC deposed many of the officers in connection with the settlement. McCloskey was questioned in March 1991. He was not represented by independent counsel at this proceeding. At the deposition, McCloskey stated that, while he viewed his retirement as mandatory, he also based his decision to retire on his wish to avoid increased income taxes and, in part, on a blood clot condition in his leg.

Based on the deposition and the questionnaire, EEOC determined that McCloskey's decision to retire before he turned 60 was voluntary. He was excluded from the benefit pool on April 19, 1991.

For the remaining eligible candidates, damage calculations under the settlement were broken into two parts. The first, "pre–1987 period," estimates harm from the individual's date of forced retirement through December 31, 1986, the date after which recent Congressional amendments to the ADEA permitted mandatory retirement for law enforcement personnel.[6] This calculation incorporates back pay and sick leave, reduced by retirement benefits—annuities—the men have already received.

---

1. The first appeal, *EEOC v. Pennsylvania*, 768 F.2d 514 (3d Cir.1985), resulted in the case being sent back for additional fact finding. Binker filed another appeal with this court that was settled on the eve of oral argument. *EEOC v. Pennsylvania*, No. 89–5557 (terminated Jan. 8, 1990 by agreement of the parties; dismissed Jan. 11, 1990, under Fed.R.App.P. 42(b)).

2. Congress amended the ADEA in October 1986, effective January 1, 1987, to exempt law enforcement officers and firefighters from coverage if a mandatory retirement policy affecting either of the two groups had been in effect as of March 3, 1983. PSP's age–60 requirement was instituted in 1929. *See* § 205(d) of the Administrative Code of 1929, P.L. 177. By its terms, however, ADEA actions initiated prior to January 1, 1987 are not affected by the amendment.

Because Binker filed this action in 1983, the 1986 amendment is not applicable here.

3. In August 1989, Binker's case was severed, and a final judgment was entered in his favor. *EEOC v. Commonwealth*, No. 83–0321 (M.D.Pa. Aug. 1, 1989) (order, amending earlier judgment, to sever Binker and enter final judgment).

4. All officers eligible for consideration in the settlement negotiations were male.

5. Only one, McCloskey, is part of this appeal.

6. As noted in the text of footnote 2, *supra*, Congress amended the ADEA in October 1986, effective January 1, 1987, to exempt law enforcement officers and firefighters from coverage.

PSP and EEOC negotiated the second part of the award formula as a compromise to their disagreement over whether claimants were entitled to relief after December 31, 1986.[7] Defined as "prospective relief," this segment runs from January 1, 1987, the effective date of the ADEA amendments, to December 31, 1989, the date serious settlement negotiation began, and consists of a fraction of between 30 and 40 percent of the individual's back pay for the three-year period. Back pay is based on December 31, 1986, earnings. The size of the multiplier depends on whether the claimant tried to find alternative employment during the pre–1987 period, and whether he incurred medical expenses that would have been covered had he continued working for PSP until the end of 1986. EEOC added the results of the pre–1987 and prospective relief periods to reach each claimant's preliminary entitlement.

All awards were then mitigated by post-retirement earnings. For some claimants, including appellant Evan, post-retirement earnings completely offset their benefits under the settlement agreement. Where straight application of the settlement formula would have eliminated these claimants' awards, EEOC and PSP agreed to award the individuals the additional pension benefits they would have received had they retired at the end of 1986, discounted to present value.[8]

In early 1991, claimants determined to be eligible for settlement funds received a notice from the EEOC, informing them of the agreement and explaining that EEOC would meet with each claimant to discuss proposed individual awards. Those choosing to take part in the settlement were asked to sign a general release in favor of PSP before March 15, 1991; according to the letter, failure to execute the release would result in PSP's retention of the officer's award. Neither the release nor the notice from EEOC contained the specific terms of the agreement. Titler and Evan did not execute the release before the March deadline.[9] In a March letter to EEOC, Titler expressed concern about his right to challenge the settlement calculation if he rejected EEOC's negotiated amount. The appellate record does not contain EEOC's response.

On April 25, 1991, EEOC and PSP notified all claimants that they intended to submit the proposed settlement to the district court and that all objections to the settlement would be heard and considered by that body. Titler and Evan submitted written objections contesting several aspects of the general formula and its individual application. Specifically, the two men asserted that the district court, in addition to its duty to review the reasonableness of the entire agreement, should have reviewed for fairness the claimants' individual awards. Evan and Titler objected as well to PSP's use of 1986 earnings to calculate relief for the prospective period (1987–89), mitigation of settlement benefits by post-retirement earnings, and reduction of the net annuity payments to present value. McCloskey challenged EEOC's decision to exclude him from the settlement.[10]

The district court held a fairness hearing regarding the proposed settlement on June 3, 1991. McCloskey submitted additional testimony regarding the voluntariness of

---

7. Though the 1986 ADEA amendment does not apply to causes of action brought prior to 1987, and therefore does not prohibit this particular suit, the parties appear to agree that the amendments affected the extent of provable injury in the post-1986 period. In fact, EEOC originally sought reinstatement for the officers but compromised on this issue once the ADEA was amended.

8. Additionally, an exception to the formula was made for those twelve officers who retired between May 1980 and May 1981—more than two but less than three years before the Commission filed its complaint. The ADEA contains a two-

year statute of limitations for nonwillful violations; the parties agreed that these officers had relatively weak claims, and negotiated a flat $5,000 award for each.

9. The record does not indicate whether McCloskey was ever asked to sign a release. In any case, because we find here that McCloskey's exclusion from the settlement was reasonable, his release of PSP *vel non* is not relevant.

10. Two other officers also challenged EEOC's decision to exclude them from participation in the agreement; only McCloskey appealed.

his decision to retire, arguing that the explanation given in his March deposition was tainted by fatigue and his failure to take his diabetes medication that morning. Evan and Titler entered no new testimony. On August 13, 1991, the court issued a memorandum and order approving the settlement agreement subject to one minor adjustment in Titler's award.[11] 772 F.Supp. 217. The court also found EEOC's decision to exclude McCloskey reasonable at the time it was made.[12] Titler and Evan appealed the court's order of approval on August 29, 1991. On September 9, 1991, McCloskey appealed the court's affirmance of his exclusion.

On August 30, 1991, in accordance with the district court's order, Titler was provided with a revised settlement calculation and a revised release by EEOC.[13] Titler refused to sign the release pending his appeal before this court. Evan similarly refused to sign. PSP then asserted that, under the terms of the settlement agreement, neither man was entitled to receive any proceeds. Paragraph 7 of the agreement provides:

> Any portion of the $2,643,036.33 which was not disbursed because of an individual's failure to sign an individual release within the time frame set by the EEOC, which shall in no event be later than the date of court approval of this agreement, will be retained by the State Police.

PSP contends that this paragraph requires execution of the release *prior* to court approval as a condition precedent to an award. EEOC, as the other party to the negotiations, does not recall drafting paragraph 7 with the intent to cause forfeiture. Rather, EEOC understands the provision to permit PSP to hold an officer's award in trust until a release is negotiated. Notably, neither Titler nor Evan has sought distribution of the funds, pending the resolution of the appeal to this court, and thus neither has actually been denied his award as a result of PSP's interpretation of paragraph 7.

Nonetheless, on October 18, 1991, Evan and Titler filed a Rule 60(b)(6) motion with the district court, seeking relief from the court's order approving the settlement. They argued that the language of paragraph 7 would permit PSP to interpret the agreement to allow forfeiture. *See* Fed. R.Civ.P. 60(b)(6).[14] The court denied the motion without opinion on November 7, 1991. Evan and Titler appeal the court's denial.

■ The appeals of the three men were consolidated for argument before a panel of this court. A district court's approval of a settlement agreement and denial of a Rule 60(b) motion are final orders over which we have appellate jurisdiction. *See* 28 U.S.C.A. § 1291.

11. The district court found that EEOC and PSP erred by reducing the prospective relief segment of Titler's award for his refusal to accept economically disadvantageous employment. Titler had turned down job offers in distant states. The district court adjusted Titler's recovery for the 1987–89 prospective relief period to reflect that he sought alternative employment, noting that the law does not generally require people to take distant jobs to mitigate damages. *See* Typescript at 10–11.

In light of our determination in Parts II.B and III, that only the settlement as a whole, and not the individual awards, can be reviewed under the ADEA, it was improper for the district court to make an adjustment to Titler's individual award. However, neither the EEOC nor the PSP objected to this procedure at the time, nor have they raised it on appeal. We will not for this reason disturb the modification of Titler's award.

12. As no party has moved for a stay of the court's order approving the settlement, those who signed releases in favor of PSP—80 of the 83 officers named in the suit—have been issued their checks. These individuals received all but $42,000 of the $2.6 million set aside for settlement. The remaining figure represents the amount of the awards challenged by Titler and Evan, including approximately $8,500 presumably dedicated to a third officer not a party to this appeal. The record does not reveal the identity or the fate of the 83rd officer.

13. Titler's award was augmented by approximately $1,000.

14. On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for ... (6) any ... reason justifying relief from the operation of the judgment. Fed.R.Civ.P. 60(b)(6).

## II.

■ Before we address the merits of the appellants' claims, we must determine whether the parties are properly before us. PSP maintains that individual employees do not have standing to appeal a district court's approval of a settlement agreement negotiated by EEOC. On the facts of this case, we cannot agree.

This particular challenge implicates two issues: the right of a nonparty to appeal a district court's order and the right of an individual employee to challenge the merits of a settlement agreement negotiated by EEOC on his behalf. The first inquiry is procedural, the second statutory. The former determines whether the appeal is possible, and the latter dictates its scope.

### A.

■ Ordinarily, those who were not parties to the proceeding below may not appeal the district court's judgment. However, we find persuasive a standard set out by the Court of Appeals for the Ninth Circuit in *EEOC v. Pan American World Airways, Inc.*, 897 F.2d 1499 (9th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 55, 112 L.Ed.2d 31 (1990), which provides that nonparties are permitted to appeal where the equities favor hearing the appeal, where the nonparties participated in the settlement agreement, and where the nonparties had a stake in its proceeds discernable from the record. *Pan Am*, 897 F.2d at 1504. *Cf. Dunlop v. Pan American World Airways, Inc.*, 672 F.2d 1044, 1052 (2d Cir.1982) (nonparty plaintiffs had standing to invoke Rule 60(b)(6) to amend a federal judgment, where they were "sufficiently connected and identified with the [EEOC] suit").

Here, Evan, Titler and McCloskey are nonparties: EEOC initiated suit against PSP on their behalf. Nonetheless, they meet the requirements of *Pan Am, supra*. Taking the third *Pan Am* factor first, it is apparent from the record that, as potential recipients of settlement proceeds, Titler

and Evan have a stake in the litigation below. Though McCloskey has been involuntarily removed as a beneficiary of the agreement, he too has a stake in the settlement proceeds to the extent he can show that the basis for his exclusion was unreasonable. Additionally, the district court encouraged individual participants, including appellants, to voice objections to the agreement. We are not faced here with individuals who chose not to be included in the negotiations. *E.g., Pan Am*, 897 F.2d at 1509 (plaintiffs had no standing to challenge merits of EEOC agreement because they had voluntarily refrained from participating in negotiations).[15] We thus find that McCloskey, Titler and Evan "participated" in the settlement within the meaning of *Pan Am*.

Finally, the equities favor our hearing this appeal. The district court invited individuals to object to the agreement and considered and rejected their complaints on the merits. Further, as we noted *supra*, the settlement formula was not applied evenly to all participants; a small number of individual adjustments were made for officers with unique circumstances, including appellants Titler and Evan. A consideration of the overall fairness of the settlement should include a review of such adjustments. The individuals affected would certainly be appropriate persons to argue the equities of the overall adjustments. On these facts, appellants have satisfied the two concerns opened up for discussion in *Pan Am*. We will exercise our discretion to hear the appeal.

### B.

■ Even if we permit the appeal, however, appellants' challenges to the agreement are not unlimited. Because EEOC initiated this proceeding on their behalf, appellants are subject to the exclusive enforcement provisions of the ADEA. Generally, under the ADEA, once EEOC commences an enforcement action against an employer, subsequent litigation by or on

---

15. The *Pan Am* panel left open the question we answer in the affirmative in this case: "whether the individual employees who benefit from the settlement have standing to challenge the settlement agreement...." *Pan Am*, 897 F.2d at 1509 n. 13.

behalf of an individual employee is prohibited. 29 U.S.C.A. § 626(c)(1).[16] *See Pan Am*, 897 F.2d at 1505; *Rogers v. Exxon Research & Eng'g Co.*, 550 F.2d 834, 841 (3d Cir.1977), *cert. denied*, 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 770 (1978); *EEOC v. Consolidated Edison Co.*, 557 F.Supp. 468, 471 (S.D.N.Y.1983) [hereinafter *Con. Ed.*]. Congress developed this rule to facilitate orderly and uniform resolution of workplace conflict. *See* S.Rep. No. 145, 87th Cong., 1st Sess. 39 (1961), *reprinted in* 1961 U.S.Code Cong. & Admin.News 1620, 1659 (automatic termination of employee's private rights is designed to "relieve the courts and employers of the burden of litigating a multiplicity of suits based on the same violations of the act by an employer"). In this case, EEOC entered negotiations with PSP on behalf of the group of officers affected by the mandatory retirement policy. At no time did the appellants bring individual suits against PSP. Thus, to the extent McCloskey, Titler and Evan seek individual remedies under the ADEA, those claims are statutorily prohibited.

Nevertheless, we find that, where nonparty employees affected by an EEOC settlement wish to contest the terms of the agreement, standing exists to challenge the overall fairness of the compromise. This limited right of appeal recognizes EEOC's dominant role in the enforcement of the ADEA without discarding the rights of affected employees. It also recognizes the dual function of the EEOC in discrimination cases, *i.e.*, to act for the benefit of specific individuals while at the same time vindicating the public interest by preventing future discrimination. *See General Telephone Co. v. EEOC*, 446 U.S. 318, 326 & n. 8, 100 S.Ct. 1698, 1704 & n. 8, 64 L.Ed.2d 319 (1980); *Con. Ed.* at 473. In evaluating overall fairness, the reviewer must balance both these functions of the

EEOC. This requires a consideration of factors beyond maximizing the potential benefit to an individual claimant.

The challenge to overall fairness also protects the rights of the employer: where individuals are permitted only to question the impact of the settlement on the employees as a whole, there is no "possibility of repetitive federal suits or of an increase in [the employer's] liability under federal laws." *Dunlop*, 672 F.2d at 1053. The agreement stands or falls in its entirety. Though there are no cases directly addressing this issue, we find support for our holding in a decision of the Court of Appeals for the Second Circuit, *Dunlop v. Pan Am*, *supra*. In *Dunlop*, the court held that individuals may challenge the overall effect of a settlement to bring it in line with federal law. *See Dunlop*, 672 F.2d at 1049–50, 1052–53 (plaintiffs permitted to seek post-judgment modification of a settlement provision that would have illegally eclipsed their state law claims).

We do not find the district court's language in *Con. Ed.*, *supra*, to the contrary. There, the court noted, in the context of denying a motion under Rule 60(b), that

> [A]n employee who fails to file a law suit seeking redress of his ADEA-recognized rights prior to the EEOC's commencement of a suit on such employee's behalf *lacks any power to assert such rights, regardless whether the assertion is attempted within or without the EEOC suit,* or before or after judgment is entered therein.

*Con. Ed.*, 557 F.Supp. at 472 (emphasis added). However, consistently with the decisions in *Pan Am* and *Dunlop, supra*, we read this provision to mean merely that nonparty appellants may not assert *individual* rights on appeal. Moreover, the *Con. Ed.* decision acknowledges that a

---

**16.** Section 7(c)(1) of the ADEA states that:
the right of any person to bring [an ADEA] action shall terminate upon the commencement of an action by the Equal Employment Opportunity Commission to enforce the right of such employee under this chapter.
29 U.S.C. § 626(c)(1). We note that section 626(c)(1) does not prevent an individual from

bringing an ADEA challenge prior to EEOC intervention (as Binker has done here). Nor does the statute deny individual standing to bring state law claims once EEOC has intervened. *See Dunlop*, 672 F.2d at 1052–53. We are not faced with either of these situations, however.

court may draw on its "inherent equitable powers" to permit challenges to EEOC's conduct of an enforcement proceeding. *Id.* at 474.

Similarly, our decision to grant these appellants limited standing to appeal does not run afoul of our earlier holding in *Hoots v. Pennsylvania,* 495 F.2d 1095 (3d Cir.) (per curiam), *cert. denied,* 419 U.S. 884, 95 S.Ct. 150, 42 L.Ed.2d 124 (1974). In that case, several school districts sought to intervene as parties in the appeal of a school desegregation plan. We affirmed the district court's denial of their motion to intervene, relying on the fact that the districts had been presented with and had rejected previous timely opportunities to be made part of the case. We held that, for a nonparty to have the right to initiate an appeal, he must make himself a party to the action by filing a petition to intervene under Federal Rule of Civil Procedure 24 and by meeting the requirements for successful intervention, including timely filing. *Hoots,* 495 F.2d at 1096 n. 3.

In this case, none of the appellants has filed a motion to intervene as a party. This would appear to preclude their appeals under *Hoots. Hoots* is distinguishable from this case on several grounds, however. Most importantly, McCloskey, Titler and Evan will not become "parties" to the action if we decide to hear their appeal; they are permitted to challenge only the overall reasonableness of the settlement agreement. Notably, *Hoots* is similar in this respect. There, the district court permitted the school districts to intervene for the limited purpose of commenting on the Commonwealth's general compliance with the court's previous order; that part of the district court's decision was not affected by our dismissal of the appeal. *See id.* at 1096 & n. 2. This difference permits us to distinguish our holdings in *Pennsylvania v. Rizzo,* 530 F.2d 501, 507 (3d Cir.1976), and *In re Fine Paper Antitrust Litigation,* 695 F.2d 494, 499 (3d Cir.1982), as well. Additionally, this proceeding arose under the ADEA rather than the Constitution. Thus, unlike the appellants in *Hoots,* the appellants here were not given prior opportunities to intervene as parties:

EEOC's suit extinguished their individual rights on the date the complaint was filed.

Moreover, by permitting McCloskey, Evan and Titler to contest the reasonableness of the agreement as a whole, we continue the parties' practice of accommodating individual objections without undermining EEOC's exclusive role under the ADEA.

We thus reject in part PSP's argument that the individual appellants in this case do not have standing to appeal the district court's approval of the settlement agreement. Standing exists to the extent the attack is limited to the fairness of the package.

### III.

█ The origins of a court's authority to review a settlement agreement in an ADEA proceeding are largely prudential. Technically, ADEA enforcement actions initiated by EEOC are not governed by Fed. R.Civ.P. 23, the provision requiring a district court to make a reasonableness determination in a class action proceeding. *See Con. Ed.,* 557 F.Supp. at 472. *See also Donovan v. University of Texas,* 643 F.2d 1201, 1208 & n. 14 (5th Cir.1981). There is therefore no *statutory* requirement that ADEA compromises be found "fair" by the court. Some courts interpret this absence of authority as an order to abstain from oversight. Thus, as one court noted when faced with an EEOC proposal:

This suit is not a class action nor does it fall within any other of the limited categories of cases in which a Court is called upon to determine the fairness or desirability of a proposed settlement. In approving this settlement, this Court merely acknowledges that the parties have exercised the right, which they have, to discontinue this litigation.

*Con. Ed.,* 557 F.Supp. at 470.

█ However, in the majority of courts, settlement agreements, including those under the ADEA, are agreed to be subject to a "universal" standard, that of fairness, adequacy and reasonableness. *See Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118

(3d Cir.1990); *Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir.1982), *cert. denied*, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983); *EEOC v. Pan Am*, 622 F.Supp. 633, 639–40 (N.D.Cal. 1985) (hereinafter *EEOC*). A settlement will be invalidated when it is the "product of fraud or overreaching by, or collusion between, the negotiating parties." *Officers for Justice*, 688 F.2d at 625. Judicial scrutiny is particularly appropriate where, as here, the settlement affects victims of age discrimination whose rights to intervene are limited once EEOC has initiated suit. *See EEOC*, 622 F.Supp. at 641. An appellate court under these circumstances reviews the district court's decision simply for abuse of discretion. *Officers for Justice*, 688 F.2d at 626. *See Walsh v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 965 (3d Cir.1983).

 With this in mind we turn to the objections raised by Titler and Evan to the EEOC settlement. They first assert that the district court should have reviewed for fairness the claimants' individual awards as well as the entire settlement. This argument does not have merit. As is obvious from the discussion above, Titler and Evan do not have standing to raise individual ADEA concerns within the context of an appeal from an EEOC settlement.[17]

 Titler and Evan next contest the mechanics of the settlement formula, beginning with the use of 1986 earnings to calculate relief for the prospective relief period (1987–89). EEOC counters that a monetary award for that period was not a foregone conclusion, as the 1986 amendments to the ADEA permitted PSP to continue its mandatory retirement policy and the district court had previously denied EEOC's claim for the officers' reinstatement. EEOC decided to negotiate money damages for the prospective relief period rather than appealing the reinstatement issue. Because adjudicated liability for the PSP ended on December 31, 1986, the negotiations were never meant to approximate lost income for subsequent years. For the district court, the relevant "reasonableness" comparison for that period is to no award at all, rather than to the full amount of lost back pay. From this perspective, the EEOC settlement actually confers an added benefit on participants. Claimants receive more than nothing—the prospective period formula includes between 30 and 40 percent of back pay for three years based on each officer's 1986 salary. Given that the award for this period was conceived as a compromise from the beginning, the district court did not abuse its discretion in determining that the use of 1986 income was reasonable.

 Titler and Evan also challenge as unfair the subtraction of post-retirement earnings from their entitlements under the settlement.[18] This argument fails as a matter of the law of damages. It is not uncommon for a court to award a disgruntled employee only the amount the individual was not in good faith able to recover

---

17. In so stating, we are not, however, precluding in appropriate instances an examination of the fairness of an award to an individual or to a small number within the larger group affected by a settlement. In determining overall fairness, these factors are among those which must be considered. *See Officers for Justice v. Civil Service Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982) (in class action settlements, the primary concern of Rule 23(e) is the protection of class members whose rights may not have been given due regard by the negotiating parties); *cf. Con. Ed.* at 474 (charges that 2 of 126 claimants had claims valued at sums significantly greater than they were to receive under the settlement and that settlement unfairly failed to provide benefits in accord with merits of each claim were insufficient to warrant the reopening of the order of dismissal "especially in light of the dili-

gent EEOC representation which the Court has observed and alluded to above....")

18. The officers cast this debate as a matter of proportions rather than as a matter of mitigation. Thus, they contrast the one dollar deducted as post-retirement earnings with the 30–40 cents awarded in the prospective period. As we conclude in the previous discussion, however, the damage calculation for the prospective period was never conceived as a dollar-for-dollar reimbursement. In fact, there was an appreciable risk that the officers would receive no relief at all for the time after December 31, 1986. We focus here, then, on mitigation generally, rather than in comparison to other segments of the award.

through alternative employment. *See Wulf v. Wichita*, 883 F.2d 842, 870 (10th Cir.1989) (directing district court to offset from plaintiff's award amounts he earned from other employment during the relevant period); *Gutzwiller v. Fenik*, 860 F.2d 1317, 1333 (6th Cir.1988) (back pay award reduced by amounts plaintiff earned, "or with reasonable diligence could have earned" after denial of tenure); *Blum v. Witco Chem. Corp.*, 829 F.2d 367, 374 (3d Cir.1987) ("A plaintiff, of course, has a duty to mitigate damages and his new salary will be deducted from the old to avoid a windfall award"); *Barnett v. Housing Auth. of Atlanta*, 707 F.2d 1571, 1579 (11th Cir.1983) (affirming computation of back pay based on difference between salary with defendant and compensation he received from later employment); *EEOC v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir. 1980) (affirming district court order reducing back pay awards by amounts received from other employment). Damages are designed to approximate only *actual* injury. *Cf. Officers for Justice*, 688 F.2d at 629–30 (award to officer protesting denial of promotion mitigated by amount of "hazard pay" he would not have received but for the failed promotion). Moreover, in this case, where strict application of the mitigation clause would have eradicated an officer's award, EEOC and PSP awarded the individual the increased amount of his annuity. Evan benefitted from this compromise. The district court did not abuse its discretion in finding the mitigation clause reasonable.

■ Finally, the two men criticize the provision in the agreement which reduces to present value a portion of the officers' awards—the segment attributable to the increase in annuity payments for which the officers would have been eligible had they not retired until December 31, 1986. The

district court found that discounting this portion of the award was fair and reasonable. The officers' criticism is misplaced. Admittedly, the Pennsylvania state courts discourage the discounting of future *income* streams, because those streams increase over time due to inflation, and the increase negates any potential investment gain. *See, e.g., Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027 (1980) (advocating the "total offset" method, under which no reduction is necessary to determine present value).[19] Reducing future income streams to present value therefore leaves the beneficiary with less than he would have otherwise received.

This is not, however, a Pennsylvania state law damage claim. Moreover, the EEOC settlement here does not reduce the entire award to its present value, only the fraction representing net annuities. As EEOC points out, the rationale counselling against discounting future income does not apply to annuity payments. Unlike salaries, annuity payments are fixed. Given the nature of annuity payments, we do not find that the district court abused its discretion in approving the agreement's allowance for the time value of money.

## IV.

■ We next turn to McCloskey's allegation that he was improperly excluded from the settlement agreement. McCloskey raises two issues regarding his exclusion: the allegedly faulty basis for EEOC's initial decision and the district court's failure to order EEOC to reconsider its decision in light of the additional evidence McCloskey furnished at the fairness hearing. We address them concurrently.

At some point prior to his retirement, McCloskey received a letter from PSP reminding him that his service requirement

---

**19.** Not all courts agree that future income streams should remain untouched. *E.g., Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 536–41, 103 S.Ct. 2541, 2550–53, 76 L.Ed.2d 768 (1983) (inflationary concerns may be incorporated into the discount rate, but do not eliminate the need to reduce the award to present value), at 550–51, 103 S.Ct. at 2557 (trial court cannot impose total offset method on unwilling litigants). *See also Monessen Southwestern Ry. Co. v. Morgan*, 486 U.S. 330, 339, 108 S.Ct. 1837, 1844, 100 L.Ed.2d 349 (1988) (where lost future earnings are included in damage award, jury must be instructed that reasonable adjustment be made for its present value); *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 377 (5th Cir. 1989) (reversing for plain error where no present value instruction given).

was complete as of his sixtieth birthday. McCloskey eventually retired on July 29, 1981, four months before he turned 60. EEOC filed the present action approximately two years later.

Early in the settlement negotiations, EEOC and PSP determined that participation would be limited to officers who had retired "involuntarily" at age 60. To ascertain whether a potential claimant would not have otherwise retired at 60, EEOC requested that each trooper fill out a questionnaire detailing the reasons for his retirement. McCloskey completed the questionnaire. In response to Question 9, he noted that his decision to retire was "involuntary." In response to Question 9c, "Reasons for retiring when you did," he reiterated that his retirement was "mandatory," but then listed his accumulated vacation and sick leave as further clarification of his decision. Finally, in response to Question 14, which sought information on illnesses occurring after retirement, McCloskey noted a recurring problem with blood clots in his legs that had "originally" surfaced in 1980. McCloskey testified that he and his wife conferred over the form, he writing the answers in pencil and she later tracing them in ink.

EEOC deposed McCloskey in Harrisburg on March 26, 1991, in connection with his potential eligibility for the plaintiff class. On that day, McCloskey, a borderline diabetic, forgot to take his diabetes medication, he did not eat breakfast, he drove six hours to get to the deposition from his home in Rochester, and then he still did not eat anything before being deposed. McCloskey's wife testified at the fairness hearing that, as a result of his diabetic condition, her husband can suffer bouts of disorientation and confusion if he does not monitor his diet carefully. McCloskey alleges that his forgetfulness affected his deposition testimony.

At the deposition, McCloskey gave several reasons for his decision to retire before his sixtieth birthday. He noted that, as he was resigned to retirement at age 60 under the PSP policy, retiring a few months early did not seem significant. *See, e.g.,* McClos-

key App. at 25a (Q: "[Y]ou chose to retire before age 60, is that correct? A: Well, I would have worked it, but it was going to be mandatory anyway"), 28a ("I had to retire anyway"), 40a ("Well, I figured I have to retire in October or November so what's the difference"), 41a ("I had to retire anyway in four months"). At one point, when asked why he chose the July date, McCloskey responded "You've got me stumped there." McCloskey App. at 25a. McCloskey also stated that were he to have retired one year before he turned 60, he still would have viewed his retirement as involuntary. McCloskey App. at 35a.

At another point in the questioning, he cited the tax savings he thought he would gain from terminating his employment in July. McCloskey App. at 32a ("I just decided to leave because like I said if you go any higher, the taxes will kill you"), 33a (Q: So it's your view that by leaving on July 29th you saved income tax, is that what you're telling me? A: Well, anybody can tell that. What you make here and what you have to add at the end of the month—the year you're going to pay more income tax soon). McCloskey also made note of the amount of his accumulated vacation leave—more than $6,000—which, as he understood it, would not have gotten any larger had he continued working until his sixtieth birthday. *See* McCloskey App. at 45a (Q: [D]id the fact that you got paid $6,072.00 for accumulated vacation leave was that one of the reasons why you left? A: Okay. Yeah, I guess), 46a (Q: Between June and the date of your 60th birthday if you had stayed you would have earned more vacation time, is that correct? A: I would have lost vacation time. You only can go with ten weeks).

Additionally, though the parties dispute the reliability of McCloskey's testimony regarding his health, McCloskey noted in his deposition a recurring problem with diabetes and a blood clot in his right leg; the latter condition prevented him from working for three months near the time he retired. *See* McCloskey App. at 38a (Q: [H]ow close did this sickness occur to the time when you left in July? Was that about—right before that? A: Yeah, right

before that, yeah.... Maybe a year before that.... I ain't sure); 37a (Q: Why do you have [the blood clot and the diabetes] listed as a reason for retiring in July? A: Well, I had problems there for awhile. I took the three months off). He indicated that the existence of the blood clot and/or the diabetes "could have helped" him decide to retire in July instead of in November. *See* McCloskey App. at 47a. McCloskey's statement that he experienced blood clot problems near the time of his retirement is corroborated by his answer to Question 14 of the EEOC questionnaire, where he declared that he originally suffered from the blood clot in 1980.[20]

Based on the information gleaned from the deposition and the questionnaire, EEOC determined that McCloskey's decision to retire in July, before he turned 60, was voluntary. In its April letter to McCloskey notifying him of the decision, EEOC emphasized McCloskey's statements about his failing health.

McCloskey maintains that EEOC's decision was based on erroneous evidence and that his exclusion was therefore unreasonable. To support this assertion, McCloskey points to the supplemental evidence he introduced at the June 1991 fairness hearing. In that proceeding, McCloskey testified that his phlebitis originally occurred in 1976; that he missed periods of work due to this condition in 1976 and 1977; and that he experienced no recurrence of the blood clot condition near the time of his retirement. This information is directly at odds with both his March deposition testimony and his answers to the EEOC questionnaire, where he stated that he originally

suffered from phlebitis in 1980 and was disabled as recently as three months before he retired. The record does not contain a copy of McCloskey's employment record with PSP, which presumably would confirm periods of disability or sick leave.

■ The district court found, without elaboration, that EEOC's decision to exclude McCloskey was reasonable at the time it was made. This was the proper foundation for making that decision because the district court was considering the overall fairness of the settlement agreement as it was originally negotiated. Included within such consideration would be the criteria used to exclude PSP retirees from the benefit pool and the evidentiary basis necessary for exclusion in a particular case. *Cf., Con. Ed.,* 557 F.Supp. at 474 (allegations by individual claimants after district court stipulated dismissal that the settlement unfairly failed to provide benefits to them were insufficient to warrant a reopening and review).[21] Admittedly, the facts introduced at the fairness hearing corroborate McCloskey's assertion that one set of his statements was confused. Had the March 1991 health statements been the only basis for EEOC's decision, we might be convinced that the district court should reconsider the reasonableness of EEOC's decision. Yet, McCloskey at the same time offered alternative reasons for his retirement—including his financial concern with being shifted into a higher tax bracket—which support EEOC's conclusion that the July date was voluntary. Moreover, as EEOC indicates, it is inescapable that McCloskey retired four months before he

20. At one point in the March deposition, McCloskey stated that he first suffered from blood clots in 1988 or 1989, long after he retired. From his other deposition testimony and his answers to the EEOC questionnaire, however, it appears that these dates are misleading; he suffered recurrences of the problem in the late 1980's, as is evident from his answers in the EEOC questionnaire, but originally developed the condition up to ten years earlier.

21. We feel compelled to note that all information available to EEOC at the time of its decision pointed toward 1980 as the year when McCloskey's health problems originally oc-

curred. This includes the EEOC questionnaire: McCloskey's answer to Question 14 indicated that the blood clot problems originated in 1980. Notably, McCloskey has never argued that his answers to the EEOC *questionnaire* were tainted by diabetic confusion. To the contrary, he testified that he and his wife conferred over the document.

However, even if we were to have taken into consideration McCloskey's additional evidence, presented at the fairness hearing, we still would have found that the district court's resolution of the factual discrepancies in favor of the EEOC's original decision was not an abuse of discretion.

turned 60, knowing that he was not *required* to do so until he reached that age.

 McCloskey offers conclusory arguments that the district court should have indulged in fact-finding when reviewing EEOC's exclusion decision, thereby making its own determination about McCloskey's eligibility for settlement funds. We find no reason to depart from established precedent limiting the court's role in reviewing a settlement agreement to an assessment of overall reasonableness. *E.g., Officers for Justice,* 688 F.2d at 625 ("Neither the trial court nor [the appellate] court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute").

We find it especially noteworthy in viewing the overall fairness of EEOC's criteria for eligibility that McCloskey did not lodge an immediate objection to the March 1991 deposition, despite his later insistence that he was medically, and mentally, impaired on that date. During the month of April, while EEOC was deliberating over his testimony, he did not raise even the possibility that his statements were incorrect. McCloskey's complaint did not surface until after he was notified of his exclusion from the claimant class. McCloskey's failure to complain permitted EEOC and PSP to rely on his statements in the March deposition and undercuts his present assertion that such reliance is misplaced.[22]

In some sense, perhaps, McCloskey's retirement was involuntary: he seriously considered retirement only after receiving PSP's prompting letter. Under this definition, however, retirement is "involuntary" where mere knowledge of PSP's mandatory retirement policy influences an officer's decision to discontinue employment. This threshold has no natural time limit: as McCloskey himself stated, he would have viewed his retirement as involuntary even if he had retired one year before his sixtieth birthday. Such a malleable standard of involuntariness is incompatible with the basis for PSP's adjudicated liability, which is for forcing officers to retire *at* age sixty, not before.

Consequently, though the evidence may be susceptible of more than one interpretation, we cannot find that the district court's approval of EEOC's decision to exclude McCloskey from the settlement, on the basis of information available to EEOC at the time, was an abuse of discretion.

## V.

 Finally, we must consider the Rule 60(b) motion filed by Evan and Titler. The district court denied the motion without opinion. The two officers contend that, if the settlement agreement is approved, PSP will interpret paragraph 7 of the agreement to require forfeiture of their awards for their failure to sign a waiver of liability in favor of PSP prior to court approval. Paragraph 7 provides that

> Any portion of the $2,643,036.33 which was not disbursed because of an individual's failure to sign an individual release within the time frame set by the EEOC, which shall in no event be later than the date of court approval of this agreement, will be retained by the State Police.

PSP's interpretation would, according to Titler and Evan, penalize them for exercising their right to appeal the district court's decision. PSP argues that a literal reading of the agreement mandates forfeiture. EEOC maintains that forfeiture of an officer's award, even for technical noncompliance with the agreement, was not contemplated in the negotiations. Rather, EEOC maintains, paragraph 7 addresses the custody of funds not distributed to the claimants at the time the district court approved the agreement. Nonetheless, EEOC notes, the Rule 60(b) motion was properly denied because it was prematurely filed: neither Titler nor Evan has requested distribution of the funds. We review for abuse of discretion, *United States v. 27.93 Acres of Land,* 924 F.2d 506, 516 (3d Cir.1991), and will affirm on procedural grounds for the

---

**22.** Though we note that McCloskey was not represented by counsel at the deposition, he, as a chronic diabetic, should have been aware that his statements might have been affected by his failure to act in accordance with his usual medical regimen.

very reason EEOC recognized, the premature nature of the claim.

Ripeness, "peculiarly a question of timing," prevents the courts from "entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agric. Prods Co.*, 473 U.S. 568, 580, 105 S.Ct. 3325, 3332, 87 L.Ed.2d 409 (1985) (citations omitted). The ripeness doctrine is generally viewed as a prudential offshoot of the case or controversy requirement under Article III of the Constitution. *See Union Carbide*, 473 U.S. at 579–81, 105 S.Ct. at 3331–33; *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 411 & n. 12 (3d Cir.1992). *Cf. Lucas v. South Carolina Coastal Council*, —— U.S. ——, ——, 112 S.Ct. 2886, 2892, 120 L.Ed.2d 798 (1992) (ripeness is a prudential requirement). Thus the courts will not decide a case where the claim involves "contingent future events that may not occur as anticipated, or indeed may not occur at all." 13A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3532 at 112 (1984). In addition, courts will consider "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Abbott Lab. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1516, 18 L.Ed.2d 681 (1967).

As the threatened implementation of paragraph 7 is a question of contract construction, which is purely legal, *see Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207, 1216 (3d Cir.1991); *Ram Constr. Co. v. American States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir.1984), the issue cannot be clarified by further factual development. In one sense, then, the question is fit for judicial decision. In a broader sense, however, the filing of a motion directed toward the threatened forfeiture of the officers' awards was premature. Evan and Titler do not argue that they ever sought distribution of their awards. The district court's order of approval does not interpret the agreement to provide for forfeiture. In fact, the district court's order does not even mention paragraph 7. There is thus no indication that the funds would be denied in the manner predicted. The threat is largely abstract. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019–20, 104 S.Ct. 2862, 2881–82, 81 L.Ed.2d 815 (1984) (denying challenge as premature where no allegation that claimed harm depended on operation of challenged statute). Moreover, Titler and Evan understand that their right to receive the awards will mature only after their appeals on the merits are finally resolved, and PSP is released from liability. Consequently, we find that the hardship to the parties of postponing judicial consideration of this issue is slight. Until the predicted injustice becomes a real and substantial threat, the officers' predicament is not justiciable.[23] *See Local 186, Int'l Bhd. of Teamsters v. Brock*, 812 F.2d 1235, 1239 (9th Cir.1987) (union's challenge to statute requiring it to place certain funds in escrow not ripe because union had not yet placed any money in escrow pursuant to statute). We will affirm the district court's order denying the Rule 60(b) motion filed by Evan and Titler.

## VI.

For the above-stated reasons, we will affirm the district court's order in all respects.

---

23. We note that such a result—PSP "profiting" from denying its employees the right to appeal—would not be supported by the plain language or context of the negotiations. *See EEOC v. Safeway Stores, Inc.*, 611 F.2d 795, 798 (10th Cir.1979) (court should adopt interpretation rendering consent decree more reasonable), *cert. denied*, 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 809 (1980). Moreover, the district court in this case invited individual objections to the settlement. Punishing these officers for taking an appeal would run counter to the contributory tenor of the settlement hearing, an atmosphere in which PSP acquiesced. Any future actions by PSP in regard to paragraph 7 will, we trust, be taken only after careful consideration of all the above.