894 F.Supp. 1329 (1995)
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,
v.
McDONNELL DOUGLAS CORPORATION, Defendant.
No. 4:95-CV-76 (CEJ).
United States District Court, E.D. Missouri, Eastern Division.
July 24, 1995.
*1330 *1331 Gretchen D. Huston, Robert G. Johnson, S. Robert Royal, C. Felix Miller, E.E.O.C., St. Louis, MO, for plaintiff.
Dennis C. Donnelly, Jerry M. Hunter, Bryan Cave, St. Louis, MO, David J. Heath, McDonnell Douglas Corp., St. Louis, MO, for defendant.

MEMORANDUM
JACKSON, District Judge.
This matter is before the Court for approval of the proposed Consent Decree filed on January 1, 1995 and amended on April 11, 1995.
In connection with this matter, the Court has received and reviewed written objections to the proposed settlement that were timely filed by or on behalf of approximately nineteen individuals. This group of objectors consists of certain eligible claimants who fall within the scope of the proposed Consent Decree and an individual whose interest is not encompassed by this litigation. The Court has also considered the parties' stipulation of facts and their memoranda filed in response to the objections and in support of the proposed settlement. On April 20, 1995, the Court conducted a fairness hearing at which the members of the class were permitted to comment on the proposed Consent Decree.

*1332 I. HISTORY OF THE LITIGATION

This lawsuit represents the culmination of a four-year investigation conducted by the Equal Employment Opportunity Commission ("Commission") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), of McDonnell Douglas Corporation's ("MDC") termination of its African-American, non-union employees between July 1, 1990 and May 1, 1991 in the St. Louis area.
Beginning in 1990, MDC, a manufacturer of commercial and military aircraft and related products, began to reduce the size of its workforce due to a downturn in business conditions. In July 1990 MDC implemented a reduction in force and gave notice of termination to approximately 2,075 of its nonunion employees working in the St. Louis area. ("Summer 1990 RIF.") In January 1991 the United States Department of Defense cancelled its contract with MDC for the development and manufacture of the A-12 aircraft. This had been a major contract for MDC and its cancellation caused the company to implement a second reduction in force affecting approximately 2,483 non-union employees in the St. Louis area as well as some union employees. ("A-12 RIF") The terminations pursuant to the A-12 RIF began in December 1990 and ended on May 1, 1991.
The Commission's St. Louis District Office received approximately twenty charges of race discrimination from non-union employees discharged pursuant to the two RIFs. After a review of these charges, the Commission determined that MDC violated Title VII, on a class-wide basis, with respect to the 82 African-American regular full-time non-union employees laid off from Departments 111, 113, 141, and 518 in the St. Louis metropolitan area from July 1, 1990 through May 1, 1991.
The Commission reviewed thousands of documents and obtained information from over fifty former MDC employees. Five subpoenas were issued to compel MDC to produce the documents relevant to the Commission's race discrimination investigation and the Commission filed suit to enforce the subpoenas. See EEOC v. McDonnell Douglas Corporation, Case No. 92-MC-85 (E.D.Mo.1992). In addition, both parties conducted statistical analyses of the terminations. Based on its statistical analysis, the Commission concluded that forty-four more African-Americans were terminated from these departments than would have been expected if race had had no impact on the termination decisions. MDC maintained that the Summer 1990 RIF and the A-12 RIF were wholly independent and should not be considered a single integrated action. MDC's analysis found a smaller disparity, and that the disparity could be explained by taking performance evaluations, education, and other legitimate, non-discriminatory reasons into account. MDC also contended that regardless of the overall statistical outcome, each individual decision was justified.
The parties began settlement negotiations in August 1993, which stalled for several months while the parties waited to find out whether the Civil Rights Act of 1991 would be applicable to this case and then resumed in June 1994. The negotiations ended with a compromise in the form of the proposed Consent Decree.

II. SUMMARY OF CONSENT DECREE PROVISIONS
The proposed Consent Decree affects a total of eighty-two "Eligible Claimants," defined as individuals who the parties agree come within the scope of this action. Included in the total number of Eligible Claimants are four individuals who filed timely charges of discrimination with the Commission ("Timely Charging Parties"), and eight individuals who previously received relief under a Consent Decree settling their claims under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq. ("ADEA"), in EEOC v. McDonnell Douglas Corporation, No. 4:93-CV-0526 (CEJ), 1993 WL 468903 (E.D.Mo. Aug. 12, 1993) ("ADEA Decree Relief Recipients.")
The proposed Consent Decree requires MDC to pay $976,760 to the Eligible Claimants. This amount is to be distributed as follows: (a) $35,000 to each of the Timely *1333 Charging Parties, plus their attorneys' fees,[1] (b) $5,000 to each of the ADEA Decree Relief Recipients, and (c) approximately $11,200 for all other Eligible Claimants.
The proposed Consent Decree further provides for the employment of twenty Eligible Claimants by MDC at a salary at least equal to the applicant's last salary with defendant and in a position located in the St. Louis area. Each of the Timely Charging Parties is guaranteed one of the positions, but the ADEA Decree Relief Recipients are not eligible to apply for these positions. The remaining positions are to be distributed among the Eligible Claimants who submitted a timely claim form and application for employment. Each Eligible Claimant, other than the ADEA Decree Relief Recipients, is also eligible to participate in Voluntary Improvement classes.
Finally, the proposed Consent Decree provides for injunctive relief in the form of an order prohibiting MDC from engaging in any employment practice in violation of Title VII and from discriminating against any individual by reason of his or her opposition to a practice that is unlawful under Title VII, and any individual who has been involved in any investigation or proceeding under Title VII or has received relief under the Consent Decree. The proposed Consent Decree also sets forth procedures that must be followed and documentation that must be prepared by MDC in the event of future workforce reductions. It requires MDC to make periodic reports to the Commission and to allow the agency access to personnel records to ensure compliance with the terms of the Consent Decree.

III. LAW GOVERNING REVIEW OF PROPOSED CONSENT DECREE
Although this is a Title VII enforcement action as opposed to a class action the settlement agreement embodied in the Consent Decree proposed here is subject to the same standard of fairness, adequacy and reasonableness that applies to settlements of class actions governed by Fed.R.Civ.P. 23. See, Binker v. Pennsylvania, 977 F.2d 738, 747 (3d Cir.1992). Thus, it has been recognized that "the Court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." Officers for Justice v. Civil Service Comm'n, 688 F.2d 615, 625 (9th Cir.1982), cert. denied sub nom., Byrd v. Civil Service Comm'n, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983). In assessing the fairness, reasonableness and adequacy of the proposed Consent Decree, the Court has given consideration to the following factors which have been deemed relevant in reviewing class action settlements:
(1) the existence of fraud or collusion behind the settlement;
(2) the complexity, expense, and likely duration of the litigation;
(3) the stage of the proceedings and the amount of discovery completed;
(4) the probability of plaintiffs' success on the merits;
(5) the range of possible recovery; and
(6) the opinions of the class counsel, class representatives, and absent class members.
Reed v. General Motors Corp., 703 F.2d 170, 173 (5th Cir.1983).

A. Fraud or Collusion
None of the objections received by the Court contain any facts or information that would demonstrate fraud by or collusion between the Commission and MDC in connection with the settlement. As the history of this litigation reflects, the parties have vigorously disputed the question of whether Title VII was violated by the implementation of the two workforce reductions. The Commission undertook a lengthy and in-depth investigation of the discrimination charges  *1334 an effort that was met with some resistance by MDC. The parties engaged in settlement negotiations that continued for several years. Both sides were represented by counsel experienced in the area of employment discrimination law, and there is no evidence of overreaching by either party. When, as in the instant case, there is no evidence of fraud, collusion, overreaching or unreasonableness by the parties, "a court should not intrude upon the settlement in question, particularly where it has been achieved through extended negotiations, carefully selected criteria, and complex calculations." EEOC v. Pennsylvania, 772 F.Supp. 217, 220 (M.D.Pa.1991), aff'd, 977 F.2d 738 (3d Cir.1992).

B. Complexity, Expense, and Duration of the Litigation
It is undisputed that absent a settlement, either on the basis set forth in the proposed Consent Decree or on some other terms, this litigation will proceed. It is also undisputed that, given the potential number of individuals alleged to have been discriminated against, the facts and circumstances peculiar to each claim and the legal issues involved in the case, the pretrial proceedings, including discovery and motions, and the trial and appellate proceedings could conceivably extend the life of this case for five years or more. To say that the expense involved in prosecuting and defending this action would be great may well be an understatement. That the attorneys fees and litigation costs could easily reach an amount equal to a significant percentage of the monetary settlement is not beyond the realm of possibilities.

C. Stage of the Proceedings and Discovery
Although no formal discovery has been conducted since commencement of this action, the parties did engage in extensive discovery prior to the filing of the complaint. The voluminous documents that have been reviewed, the interviews of potential witnesses, and the analyses of all the information that was gathered have brought the case to a point at which an informed assessment of its merits and the probable future course of the litigation can be made. See, Armstrong v. Board of School Directors, 616 F.2d 305, 325 (7th Cir.1980).

D. Probability of Plaintiff's Success on the Merits and Range of Recovery
As discussed above, the parties continue to disagree as to the merits of this action and the proposed Consent Decree expressly reflects MDC's non-admission of liability. If the case was to proceed to trial, the Commission would seek to persuade the Court to accept its statistical model which reflects that as many as forty-four individuals in departments 111, 113, 141, and 518 were discriminated against by MDC. This is less than 55% of the total number of Eligible Claimants who would receive relief under the terms of the Consent Decree. MDC's statistical model distinguishes between the Summer 1990 RIF and the A-12 RIF and reflects a significantly smaller number of victims. Further, defendant argues that it can demonstrate legitimate, non-discriminatory reasons for each individual termination decision. While the Commission does not concede the validity of MDC's model, it recognizes that there is evidence and legal authority that support it.
At this stage of the proceedings the Court has not been called upon nor should it attempt to determine the merits of either party's position. See, Officers for Justice, 688 F.2d at 625. Rather, the Court finds only that there are material disputed issues of fact as to whether the workforce reductions were implemented in a discriminatory manner or had a discriminatory impact and, if so, who are the victims. The Commission's success on the issue of liability clearly is not a certainty at this time.
Even if the Commission were able to prove liability, there remains the question of damages. Some of the Eligible Claimants may have mitigated or reduced their claims for back pay such that if they were to prevail they would be entitled to damages in an amount less than that contemplated by the Consent Decree or no damages at all. See, EEOC v. Delight Wholesale Co., 973 F.2d 664, 670-71 (8th Cir.1992). And, of course, if the Court were to accept MDC's statistical model, the number of individuals entitled to *1335 back pay or equitable relief would be far less than the number eligible to participate in the settlement.
As discussed more fully below, the majority of the objections received by the Court concerned the amount of the monetary payments to be made pursuant to the Consent Decree. The Court finds significant that the settlement provides for monetary compensation to eighty-two individuals. Only four individuals had preserved their private right of action by filing timely charges of discrimination with the Commission. Thus, the proposed settlement clearly affords a greater opportunity for a larger number of potential victims to obtain relief.

E. Opinions of Class Counsel, Class Representatives and Class Members
Counsel for the parties conducted extensive negotiations in this matter and reviewed myriad documents prior to the filing of this action. Based on their knowledge of this case and the applicable law as well as their experience in litigating employment discrimination claims, counsel believe that the proposed settlement is fair, adequate and reasonable. Although the Court is not bound by counsel's opinion, the opinion is nevertheless entitled to considerable weight. Cotton v. Hinton, 559 F.2d 1326, 1330-1331 (5th Cir.1977); In re Federal Skywalk Cases, 97 F.R.D. 380, 389 (W.D.Mo.1983). Likewise, the opinion of the Commission as to the fairness, adequacy and reasonableness of the settlement is accorded great weight in light of the agency's expertise in employment discrimination litigation in general and its intimate knowledge of this case in particular. See, Holden v. Burlington Northern, Inc., 665 F.Supp. 1398, 1422 (D.Minn.1987). With respect to the class members' opinions, the Court finds it significant that fewer than twenty percent of the Eligible Claimants filed timely objections to the proposed Consent Decree. Clearly, "the existence of objecting class members is relevant ... when considering the merits of a proposed settlement." Id. However, a settlement may be deemed fair even when a large number of class members oppose it. Id. See also, Reed, 703 F.2d at 174; Cotton, 559 F.2d at 1331. Thus, the number of objections is not an impediment to the Court's approval of the proposed settlement in this case.

IV. OBJECTIONS
The Court's assessment of the proposed Consent Decree has necessarily included consideration of the objections filed by those individuals who would be affected by the settlement as well as those who are excluded from its scope. Upon review of the objections, the Court finds that the vast majority of them are directed to the following issues:

A. Adequacy of Relief
Challenges to the monetary provisions of the proposed Consent Decree represent the largest category of objections. Many of the individuals who objected on this point contend that the settlement is unfair because it provides for relief in an amount less than the back pay and other benefits they claim they would have been entitled to but for the termination of their employment. In fact, a number of these objectors submitted to the Court detailed estimates of the recovery they believe themselves to be entitled that were calculated according to their individual circumstances. These calculations are premised on various assumptions, such as continued employment and continued salary increases at a particular rate. A few of the objectors included claims for pain and suffering they experienced as victims of discrimination.
Objections based purely upon individual claims of loss do not warrant disapproval of the proposed settlement. See, EEOC v. Pennsylvania, 772 F.Supp. at 220. In assessing the fairness of a settlement, the Court's role is not to make a de novo evaluation of whether the measures applied to all claimants provide each individual with a satisfactory recovery. Rather, the criteria or methodology employed by the litigants is sufficient if its terms, when applied to the entire group of individuals represented, appear reasonable. Id.
The monetary provisions of the Consent Decree represent the compromise reached by *1336 the Commission and MDC after extensive negotiations. Admittedly, no effort was made to calculate the potential recovery of each individual claimant. However, none was required. Instead, the parties made separate calculations, based on their respective statistical models, taking into account such factors as subsequent layoffs and retirements, interim earnings and mitigation efforts by the claimants. Based on these calculations, each party arrived at an amount representing the potential monetary recovery. The parties ultimately achieved a compromise as to the monetary relief. The Court finds that the methodology by which the parties reached this result is reasonable.
In light of the uncertainty as to the number of actual victims of discrimination and, hence, the total amount of any recovery, it cannot be said that the monetary relief provided by the Consent Decree is inadequate. Further, these aspects of the settlement are not to be viewed in isolation for "[i]t is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." Officers for Justice, 688 F.2d at 628. In this regard, the proposed Consent Decree provides for the employment of 20 claimants and the payment of annual wages in excess of $540,000. This represents an additional potential benefit to roughly twenty percent of the entire class. The objections do not dissuade the Court from its belief that the relief to be accorded to the claimants is both adequate and reasonable.

B. Comparison to ADEA Consent Decree
A second category of objections consists of challenges based on a comparison between the amount of monetary relief in this case and the amount provided to the claimants in an age discrimination case brought by the Commission against MDC. EEOC v. McDonnell Douglas Corporation, No. 4:93-CV-0526 (CEJ), 1993 WL 468903 (E.D.Mo. Aug. 12, 1993) ("McDonnell Douglas-I"). The cases are readily distinguishable and any comparison between the two is misplaced.
McDonnell Douglas-I was an action brought under the ADEA. The relief available under the ADEA includes liquidated damages for willful violations, and 45% of the direct monetary relief in McDonnell Douglas-I was attributable to liquidated damages. In contrast, the instant action is brought pursuant to Title VII. Prior to the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071 (eff. Nov. 21, 1991), monetary relief under Title VII back pay and interest. As an additional distinction, the Commission recognizes that there is little direct evidence of race discrimination in this case. In McDonnell Douglas-I there were dozens of witnesses who could testify that they were told by MDC's managers that they were selected for termination because of their age and/or retirement eligibility and numerous documents indicating that age used as a selection criteria for termination. Further the average salary of the class members in McDonnell Douglas-I was approximately $42,000 and in the instant case it is only approximately $27,300. Thus, the potential back pay liability was greater in the earlier case than it is here.
At least one of the ADEA Decree Relief Recipients argues that his relief in this case should not be reduced because of his participation in McDonnell Douglas-I. The ADEA Decree Relief Recipients have already received a monetary award to compensate them for back pay. Although this action is brought pursuant to Title VII rather than the ADEA, it reasonable that the relief provided to the ADEA Decree Relief Recipients be reduced to compensate for the past award of back pay.
Finally, a number of the Timely Charging Parties and other Eligible Claimants argue that the jobs provided to the class members in McDonnell Douglas-I included a guaranteed position for a fixed period of time while the positions to be offered under the proposed decree in this case do not. However, the guaranteed employment in McDonnell Douglas-I was limited to contract jobs that did not include pension or health benefits and were conditioned upon no unexpected and dramatic contract cancellations. There was no guaranteed term of employment for "regular" positions in McDonnell Douglas-I.

*1337 C. Safeguards to Prevent Discriminatory Discharge of Rehired Class Members

A number of the class members argue that there are inadequate safeguards to protect individuals rehired pursuant to the Consent Decree from discrimination or retaliation. The proposed Consent Decree enjoins MDC from engaging in any employment practice in violation of Title VII. Further, it imposes specific procedures to be followed in the event of any subsequent layoffs, requires extensive reporting for future layoffs and retirements, and expressly provides for periodic monitoring by the Commission. The Court is convinced that there are adequate safeguards to protect the Eligible Claimants from retaliation.

D. Exclusion From Group of Timely Charging Parties
An objection has been asserted by Walker Bond, an individual not defined as an Eligible Claimant, who contends that he has been improperly excluded from the group of Timely Charging Parties. However, the information presented at the fairness hearing revealed that Mr. Bond was employed in Department 842 and as such is not eligible to participate in the proposed Consent Decree.

E. Other Objections
Other objections concern matters such as MDC's non-admission of liability, the lack of punitive sanctions, and the location of the voluntary improvement classes. These objections have been considered by the Court, but they do not demonstrate any unreasonableness, unfairness or inadequacy of the proposed settlement.

V. CONCLUSION
The Court has reviewed each of the written objections that have been filed as well as the comments made during the fairness hearing and has carefully considered them, although not addressing each one individually. Many of the objectors have related in poignant detail the hurt and the hardship they have suffered since losing their jobs. The Court is not unsympathetic to the concerns expressed by the individuals who have objected to the proposed settlement nor does the Court doubt their sincerity.
However, it is not the Court's purpose here to determine the merits of the Commission's enforcement action or the claims of any individual who may have sustained injury by reason of the workforce reductions. Rather, the issue before the Court is whether the proposed Consent Decree, which embodies the parties' efforts to resolve the disputed factual and legal issues in this case, is fair, adequate and reasonable. For the reasons set forth above, the Court finds that it is.
The Court will, therefore, give final approval to the Consent Decree. An appropriate order will be entered accordingly.

ORDER
In accordance with the Memorandum filed herewith this date,
IT IS HEREBY ORDERED that the proposed Consent Decree, filed on January 11, 1995 and amended on April 11, 1995, be and it is approved.
NOTES
[1] The attorneys' fees are to be paid on a pro rata basis limited to a maximum aggregate amount of $10,000 for the four Timely Charging Parties.