

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-20-2006

# In Re: Nutraquest

Precedential or Non-Precedential: Precedential

Docket No. 04-4387

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"In Re: Nutraquest " (2006). *2006 Decisions.* Paper 1665.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1665

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-4387

IN RE: NUTRAQUEST, INC.,
Debtor

Civil Action No. 03-cv-05869

LINDA WILL; GEORGE WHEELER, JR.,
as Independent Co-Administrators of
the Estate of RASHIDI WHEELER, deceased

v.

NORTHWESTERN UNIVERSITY; CHARLES TAYLOR;
RANDALL WALKER; JERRY BROWN;
TERRENCE AGGELER,
LARRY LILJA; THOMAS CHRISTIAN;
JUSTIN CHABOT; MICHAEL ROSE;
MARK GARDNER, M.D.

v.

*NEXT PROTEINS, INC., f/k/a Next Nutrition, Inc.,
d/b/a Next Proteins International ;
THE ULTIMATE ORANGE ENERGY CO. LLC;

ULTIMATE ENERGY CO.;
PHOENIX LABORATORIES, INC.;
GENERAL NUTRITION CORPORATION,
d/b/a General Nutrition Companies, Inc.,
a wholly owned subsidiary of ROYALO NUMICO NV,
CYTODYNE TECHNOLOGIES, INC., n/k/a
NUTRAQUEST, INC.,
Third Party Defendants

Adversary Proceeding No. 04-cv-01275

Northwestern University, Charles Taylor,
Randolph Walker,
Jerry Brown, Terence Aggeler, Larry Lijla,
Thomas Christian,
Justin Chabot and Michael Rose,
Appellants

*(Amended Per the Clerk's Order dated 6/24/05)

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 03-cv-05869)
District Judge: Honorable Garrett E. Brown, Jr.

_____

Submitted Under Third Circuit LAR 34.1(a)
November 15, 2005

Before: BARRY and AMBRO, <u>Circuit Judges</u>
and POLLAK[*], <u>District Judge</u>

(filed: January 20, 2006)

_____

OPINION OF THE COURT

_____

AMBRO, <u>Circuit Judge</u>

Rashidi Wheeler, a football player at Northwestern University, died during a team practice. His estate[1] sued Northwestern. Because Wheeler had ingested ephedra-containing products on the day he died, Northwestern sued the makers of these products for contribution. Nutraquest, Inc., one of these third-party defendants (all of whom were ultimately sued by Wheeler as well as by Northwestern), filed for bankruptcy and settled with Wheeler (as did some of the other third-party defendants). The District Court approved the settlement, finding that it met the requirements of Bankruptcy Rule 9019 and the Illinois Joint Tortfeasor Contribution Act,

_____

[*] Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

[1] For convenience we shall refer simply to Wheeler in this opinion.

3

and barred Northwestern's contribution claims against the settling third-party defendants. We hold that the Court properly applied our Court's factors in approving the settlement under bankruptcy law and that it did not abuse its discretion in finding the settlement was made in good faith under Illinois law. We therefore affirm.

## I. Factual Background and Procedural History

Wheeler was a starting safety at Northwestern. During a 2001 team conditioning test, he collapsed and died. Emergency medical personnel did not arrive until almost 40 minutes after Wheeler's collapse. The Cook County Medical Examiner concluded that he had died from bronchial asthma.

Earlier that day, Wheeler had taken two supplements containing ephedra and caffeine. One supplement was made by a company called Next Proteins, Inc. The other—Xenadrine RFA-1—was made by Phoenix Laboratories, Inc. at the direction of Nutraquest (formerly Cytodyne Technologies, Inc.). These supplements were purchased at a store owned by General Nutrition Corporation (GNC). (Ephedra was banned by the Food and Drug Administration in 2004 because of the risk of heart arrhythmia and stroke associated with it.)

In August 2001 Wheeler (through his parents and co-administrators, Linda Will and George Wheeler, Jr.) sued Northwestern and its personnel in Illinois state court, claiming

that he died from an acute asthma attack to which the defendants failed to respond appropriately. Northwestern, believing that Wheeler's death was related to his ingesting the ephedra-containing products, filed a third-party complaint seeking contribution from Nutraquest, Phoenix Labs, Next Proteins, and GNC. Wheeler did not initially sue any of these third-party defendants.

In July 2003—just before the statute of limitations expired—Wheeler amended his complaint to add claims against the third-party defendants. In October 2003 Nutraquest filed a voluntary bankruptcy petition under Chapter 11 in the United States Bankruptcy Court for the District of New Jersey. Five days later, Wheeler voluntarily dismissed his claims against the third-party defendants, including Nutraquest.

After Nutraquest's Chapter 11 filing, 52 pending wrongful-death and personal-injury actions were transferred to the District of New Jersey on the ground that they were related to the bankruptcy filing in that District. Wheeler moved for a remand back to Illinois state court, but the District Court denied his motion. The Court and the bankruptcy parties began resolving the tort claims in an organized way: Nutraquest retained litigation counsel, steering committees were created, and test cases were designated and set for trial in early 2005.

In September 2004 Wheeler entered into a tentative settlement agreement with Nutraquest, Phoenix Labs, and GNC.

The settlement was for $75,000 in cash ($25,000 from each of the settling defendants) and an allowed general unsecured $25,000 claim against Nutraquest's bankruptcy estate. Northwestern contrasts this comparatively small sum with the millions of dollars Wheeler sought from it. Nutraquest's insurer is paying Nutraquest's and GNC's shares of the cash settlement. (GNC was shielded from direct liability by Nutraquest's insurer because Nutraquest had agreed to indemnify GNC for any liability arising from Nutraquest's products.) When the settlement agreement was executed tentatively (pending Court approval), Wheeler was still within the one-year period allowed by Illinois law to reassert his claims against the settling defendants. But by the time the settlement became effective after receiving the required approval, Wheeler's time for reasserting claims against the settling defendants had expired.

The settlement was conditioned on the District Court's (1) finding that it complied with the requirements for approval under Bankruptcy Rule 9019(a),[2] (2) making a determination that the settlement was entered into with good faith under the Illinois Joint Tortfeasor Contribution Act, 740 Ill. Comp. Stat. 100/1 *et seq.*, and (3) barring Northwestern's contribution claims against the settling defendants. Northwestern objected to the settlement, but the District Court approved it in November

---

[2] "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

2004, barred and dismissed all third-party claims under the Illinois Contribution Act,[3] and remanded the case to Illinois state court. Northwestern appeals the approval of the settlement.

## II.  Jurisdiction

The District Court had jurisdiction over the claims against Nutraquest under 28 U.S.C. §§ 1334(b) and 157(b)(5). Because the Court's order approving the settlement agreement is a final order, we have appellate jurisdiction under 28 U.S.C. § 1291. *Binker v. Pennsylvania*, 977 F.2d 738, 744 (3d Cir. 1992).

## III.  Standard of Review

We review the District Court's approval of the settlement for an abuse of discretion. *See Myers v. Martin* (*In re Martin*), 91 F.3d 389, 391 (3d Cir. 1996). The question of whether it applied the proper test in approving the settlement we review *de novo*. *Fry's Metals, Inc. v. Gibbons* (*In re RFE Indus., Inc.*), 283 F.3d 159, 165 (3d Cir. 2002).

We review the District Court's good-faith determination under the Illinois Contribution Act for an abuse of discretion. *Johnson v. United Airlines*, 784 N.E.2d 812, 821–22 (Ill. 2003).

---

[3] We note that the District Court's authority to do this was not questioned directly.

## IV. Discussion

### A.     The District Court's approval of the settlement under bankruptcy law

A district court has the authority to "approve a compromise or settlement" on the bankruptcy trustee's motion. Fed. R. Bankr. P. 9019(a). Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them. *See Martin*, 91 F.3d at 393; *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). According to *TMT Trailer*, settlements must be "fair and equitable." 390 U.S. at 424. The District Court approved the Nutraquest settlement under both the "fair and equitable" standard and under the *Martin* test set out more fully below.

We have two issues to decide under the bankruptcy portion of this case. Northwestern disputes the Court's use of *Martin* as the proper test. In any event, Northwestern also claims that the Court incorrectly approved the settlement both under *Martin* and under the "fair and equitable" standard of *TMT Trailer*.

8

### 1. Was *Martin* the proper standard to use in approving the settlement?

*Martin* provided four criteria for a court to consider when faced with a proposed settlement: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Martin*, 91 F.3d at 393. We followed *TMT Trailer* in listing these factors, *id.* (citing *TMT Trailer*, 390 U.S. at 424–25), and simply fleshed out its general requirement.

Northwestern disputes the use of *Martin*. Its primary argument is that *Martin* is only useful when analyzing a settlement of a claim belonging to the debtor, not a claim against the debtor. We disagree.

We did not hold in *Martin* that the factors were only to be used to scrutinize settlements of claims held by the debtor. In fact, *Martin* itself involved a settlement partially of claims against the debtor. The Martins contracted to sell their house to the Myerses, but the Myerses refused to go through with the purchase. *Id.* at 391. The Martins, who had been depending on the sale to go through, found themselves in dire financial straits and had to file a Chapter 7 bankruptcy petition. *Id.* Both parties filed contract suits in state court, the Martins for damages and the Myerses for specific performance. *Id.* The trustee's

9

proposed settlement provided for the release of both actions. *Id.*

Two other points are worth making here. First, the "*Martin*" factors have been around for a long time, far longer than *Martin* itself or even *TMT Trailer*. Second, there are several cases applying these four factors to settlements of claims against debtors.

The *Martin* Court "t[ook its] cue" from *TMT Trailer*, *id.* at 393, but the origin of the four factors can be traced back to a 1929 Eighth Circuit case. Four considerations were listed in *Drexel v. Loomis* for scrutinizing a compromise in bankruptcy: "(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views . . . ." 35 F.2d 800, 806 (8th Cir. 1929).

Moreover, there are many cases that have applied the *Drexel–TMT Trailer–Martin* factors to settlements involving claims against debtors. *See, e.g.*, *Ars Brook, LLC v. Jalbert* (*In re ServiSense.com, Inc.*), 382 F.3d 68, 70–72 (1st Cir. 2004); *Rivercity v. Herpel* (*In re Jackson Brewing Co.*), 624 F.2d 599, 601–02 (5th Cir. 1980); *Bache & Co. v. Loeffler* (*In re Equity Funding Corp. of Am.*), 519 F.2d 1274, 1275, 1277 (9th Cir. 1975); *Am. W. Airlines, Inc. v. City of Phoenix* (*In re Am. W. Airlines, Inc.*), 214 B.R. 382, 384, 386 (Bankr. D. Ariz. 1997);

10

*Tindall v. Mavrode* (*In re Mavrode*), 205 B.R. 716, 719, 721 (Bankr. D.N.J. 1997); *Jacobson v. Robert Speece Props., Inc.* (*In re Speece*), 159 B.R. 314, 316–17 (Bankr. E.D. Cal. 1993).

## 2. Should the settlement have been approved?

Even applying *Martin*, Northwestern challenges the outcome reached by the District Court. The Court used the "fair and equitable" rubric as well as the *Martin* factors to approve the settlement. We examine its findings for an abuse of discretion, at root a deferential standard of review. We do not "disturb an exercise of discretion unless there is a definite and firm conviction that the court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 320 (3d Cir. 2001) (internal quotation marks omitted). Put another way, for us to find an abuse of discretion the District Court's decision must rest on "a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.* (internal quotation marks omitted).

### i. *Was the settlement fair and equitable?*

*TMT Trailer* held that compromises must be "'fair and equitable,'" just as do the "other aspects of reorganizations." 390 U.S. at 424. Under the "fair and equitable" standard, we look to the fairness of the settlement to other persons, *i.e.*, the

parties who did not settle. *See, e.g.*, *id.* at 435; *Feld v. Zale Corp.* (*In re Zale Corp.*), 62 F.3d 746, 754 (5th Cir. 1995). Although Nutraquest points out that Northwestern was the only creditor to object to this settlement, this is merely "noteworthy, albeit not conclusive." *Rivercity*, 624 F.2d at 605; *see also In re Boston & Providence R.R. Corp.*, 673 F.2d 11, 13 (1st Cir. 1982) (*per curiam*) ("[T]he court must act independently, out of its own initiative, for the benefit of all creditors. This obligation prevails even where the creditors are silent . . . .").

The District Court found that the settlement was fair and equitable for three reasons. First, Wheeler's failure to file a proof of claim against Nutraquest is irrelevant; that failure may simply reflect Wheeler's perceived weakness of his claims against Nutraquest. Wheeler's noncreditor status does not negate the possibility that this settlement could have achieved benefits for the bankruptcy estate. The $25,000 in cash and the $25,000 unsecured claim are not *per se* unfair to Nutraquest's creditors.

Second, the Court found that Northwestern would not be significantly prejudiced by the settlement because it would retain all of its defenses in the Wheeler suit. Northwestern can still argue proximate cause, it can still argue contributory negligence, and it likely can get a setoff of at least $75,000 from the settlement. Northwestern may be barred by statute from seeking contribution, but that does not mean that it has lost the Wheeler suit.

12

Third, the Court found that the settlement is not unfair because that is not what affects Northwestern's rights to contribution.  Its injury stems instead from the Illinois Contribution Act, which post-settlement cuts off its contribution rights.  And this effect is only potential, because if Northwestern loses the Wheeler suit for reasons unrelated to the ephedra issue, it would have few (if any) contribution rights against the settling defendants.

In this context, we cannot decide that the District Court abused its discretion in finding the settlement "fair and equitable."

> ii.  *Should the settlement have been approved under the* Martin *factors?*

The parties agree that the second factor (ease of collection) is not relevant here, so we only discuss three of the four *Martin* factors.

Northwestern argues that the District Court failed to consider the probability-of-success-in-litigation factor. Northwestern contends that the likelihood of success would have been zero, because Wheeler would not have been able to reassert his previously dismissed claims against the settling defendants under the Illinois statute of limitations.  While the Court did not devote a full section in its opinion to this factor (as it did for two of the other factors), it said elsewhere that

13

Wheeler's "decision not to pursue claims against the Settling Defendants may reflect weaknesses in [his] claims and little likelihood of success on the merits." *In re Nutraquest, Inc.*, Civ. No. 03-5869 (GEB), mem. op. at 7 (D.N.J. Nov. 17, 2004).

Northwestern asserts also that the complexity-expense-and-delay factor does not apply; that there is no litigation to discuss; and that Northwestern's defense in Wheeler's action against it will still involve discovery concerning Nutraquest's manufacture and sale of ephedra products, thus leading nonetheless to expense and inconvenience for Nutraquest. It is axiomatic that settlement will almost always reduce the complexity and inconvenience of litigation. *See, e.g.*, *TMT Trailer*, 390 U.S. at 434 ("Litigation and delay are always the alternative to settlement, and whether that alternative is worth pursuing necessarily depends upon a reasoned judgment as to the probable outcome of litigation."). Because Wheeler appeared to have a low probability of success, the Court easily could have found that Nutraquest's escaping via settlement a complex defense of a weak case was a good move (although the Court did not make this statement explicit). The balancing of the complexity and delay of litigation with the benefits of settlement is related to the likelihood of success in that litigation. *See id.* In this regard, it is simply good judgment—thus the opposite of an abuse of discretion—to conclude that the discovery Nutraquest faces from Northwestern will be less inconvenient and expensive than defending Wheeler's suit against it.

14

For the last factor, Northwestern argues that the settlement was not in the creditors' interest. The Court held that the "insignificant disadvantages" to Northwestern, the only objecting creditor, did not outweigh the benefits to the estate. Northwestern cites to a bankruptcy court case from Florida, *In re Covington Props., Inc.*, 255 B.R. 77 (Bankr. N.D. Fla. 2000), to suggest that this settlement cannot be approved. In *Covington* the Talley family, insiders who held over 90% of the debtor's secured debt, sought to settle with the debtor. This settlement would have resolved not only all claims held by the debtor but also all claims held by the debtor's creditors against the Talley family. The only other creditors were the McAlisters—noninsiders—and they had filed a separate lawsuit in state court against members of the Talley family. Because the members of the Talley family were the "major creditors" of the estate, they stood to recoup most of their settlement payments, so the settlement was designed simply to cut off the McAlisters' state-court claims. *Id.* at 79. The Court held this settlement not "fair and equitable," and disapproved the settlement agreement. *Id.* at 79–80.

The result in *Covington* is easily distinguishable from the situation here. *Covington* involved a group of insiders using their powers to insulate themselves from litigation outside the bankruptcy context by the only (and noninsider) creditors of the estate. Here, on the other hand, Nutraquest is but one of a handful of potential defendants who settled with Wheeler. Although Northwestern is a possible creditor of Nutraquest, this

15

settlement had nothing to do with insulating Nutraquest insiders from claims of its creditors. Nutraquest had, at the time of its Chapter 11 filing, 52 cases pending against it. Northwestern was simply a plaintiff in one of those cases for contribution, and Illinois law bars it from getting contribution from Nutraquest once Nutraquest settles with Wheeler. The harms present in the *Covington* case are not present here.[4]

---

[4] Northwestern also raises the issue that the payment of the cash settlement by Nutraquest's insurance company diminishes the estate by reducing the pool of potential insurance proceeds. Nutraquest's right to its insurance-policy proceeds is property of the estate under 11 U.S.C. § 541(a). *Am. Bankers Ins. Co. of Fla. v. Maness*, 101 F.3d 358, 362 (4th Cir. 1996); *St. Clare's Hosp. & Health Ctr. v. Ins. Co. of N. Am.* (*In re St. Clare's Hosp. & Health Ctr.*), 934 F.2d 15, 18–19 (2d Cir. 1991); *Tringali v. Hathaway Mach. Co., Inc.*, 796 F.2d 553, 560 (1st Cir. 1986); *see also* Blake Rohrbacher, Note, *More Equal than Others: Defending Property-Contract Parity in Bankruptcy*, 114 Yale L.J. 1099, 1125 (2005).

The exception to this general rule arises when the debtor does not own the insurance proceeds, but just owns the policy. For example, when the debtor was a corporation, but the liability policy insured only the corporation's directors and officers (and would pay only to them), the liability proceeds were not property of the bankruptcy estate. *La. World Exposition, Inc. v. Fed. Ins. Co.* (*In re La. World Exposition, Inc.*), 832 F.2d 1391, 1399–401 (5th Cir. 1987). This exception does not fit our case, in which the insurance policy and any proceeds from it both belong to

**B.     The District Court's good-faith determination under Illinois law**

The Illinois Contribution Act provides that tortfeasors who settle claims with the plaintiffs are "discharged from all liability for any contribution to any other tortfeasor." 740 Ill. Comp. Stat. 100/2(d). The only statutory requirement for this discharge is that the release in the settlement be "given in good faith." *Id.* 100/2(c); *Johnson v. United Airlines*, 784 N.E.2d 812, 818 (Ill. 2003).

The Illinois Supreme Court's *Johnson* decision provides guidance for this good-faith determination. A settlement is not in good faith if the settling parties "engaged in wrongful conduct, collusion, or fraud." *Id.* at 821. There is no evidence of that in this case. A settlement cannot "satisfy the good-faith requirement if it . . . is inconsistent with the policies underlying

---

Nutraquest. The District Court was therefore incorrect when it suggested that the estate was not diminished at all by the settlement.

But this does not undercut the District Court's larger point that "Nutraquest avoids the significant expense and delay inevitably involved in litigating this action," and the further point that "[b]y settling, Nutraquest can focus its resources towards resolution of the remaining claims and efficient administration of the estate." *In re Nutraquest, Inc.*, mem. op. at 7.

17

the Act." *Id.* The test of good faith is "a matter left to the discretion of the trial court based upon the court's consideration of the totality of the circumstances." *Id.* As noted already, we thus review the District Court's determination for an abuse of discretion. *Id.* at 821–22.

### 1. Was the settlement consistent with the policies underlying the Illinois Contribution Act?

We first must decide whether the settlement is inconsistent with the policies underlying the Illinois Contribution Act. The policies promoted by the Act are twofold: it favors both settlement and the "equitable apportionment of damages among tortfeasors." *Bowers v. Murphy & Miller, Inc.*, 650 N.E.2d 608, 611 (Ill. App. Ct. 1995), *cited in Johnson*, 784 N.E.2d at 820. A settlement agreement cannot be inconsistent with either of these two policies. *Johnson*, 784 N.E.2d at 821.

Northwestern maintains that the District Court failed to consider whether the settlement contravened the Act's policy goal of equitable apportionment of liability. We conclude that the Court did not abuse its discretion, as its discussion meets the requirement to consider the Act's policies.

The Court did examine the fair shares of the settling defendants. Finding these within the range of reasonableness, it was able to determine that the settling defendants were not

18

dumping a "large and inequitable portion" of their liability onto Northwestern's shoulders. Because the Court did not find a violation of the Act's policies (which include the policy favoring settlement), it did not have to make detailed findings about how much liability was being shifted to Northwestern to find good faith. Moreover, courts are not required to "rule on the relative liabilities of the parties before making a good-faith determination." *Id*. at 824.

## 2. Was the settlement made in good faith?

The District Court found that the settlement was made in good faith. Northwestern disputes this finding with two arguments. First, the settlement shifted an inequitable share of liability to Northwestern. Second, the settlement was motivated by a desire to impede Northwestern's contribution claims.

Northwestern claims that the settlement amount is not commensurate with the settling defendants' liability. It characterizes the $75,000-plus settlement consideration as nominal. But Wheeler found so little value in his claims against the settling defendants that he dismissed them. The low settlement amount simply reflects his valuation of the claims. Northwestern continues to press its claims that Wheeler died from the ingestion of ephedra, but if it is correct, it will win at trial under proximate causation or contributory negligence.

As previously pointed out, Northwestern finds alarming

19

the difference between the $75,000 cash settlement and the millions claimed by Wheeler. But Illinois courts have dismissed similar arguments. *See, e.g.*, *Wreglesworth v. Arctco, Inc.*, 740 N.E.2d 444, 455–56 (Ill. App. Ct. 2000) (noting that, because the settling defendant "owed no duty," zero would have been reasonable, so the $5,000 settlement payment did not suggest bad faith); *cf. Alvarez v. Fred Hintze Constr.*, 617 N.E.2d 821, 824–25 (Ill. App. Ct. 1993) (holding that a settlement is not unreasonable just because "the plaintiff's actual damages exceed the amount of the settlement" when the claim was for over $1 million and the settlement was for $400,000). In *Johnson* itself, the defendant city claimed absolute immunity from tort liability, and at the time the plaintiffs settled with the city—for $1,000 per plaintiff—they had not directly sued the city. 784 N.E.2d at 823. The Court found the nominal settlement sound given the relative weakness of the claims, as shown by plaintiffs' well-researched decision not to sue the city. *Id.* The District Court here did a similar analysis, basing the reasonableness of the settlement amount in part on Wheeler's initial decision not to sue the settling defendants. While the Court's analysis arguably could have been more probing, the counter-argument is to ask why the need where the answer appeared so intuitive. No matter what, the Court's determination was not an abuse of discretion.

Northwestern disputes the District Court's good-faith determination for two additional reasons. First, Northwestern argues that the settlement was simply a tactical attempt to get the case remanded back to Illinois state court. The *Johnson* Court

20

dismissed the argument that motivations of "matters of venue" alone constituted bad faith and noted that the forum benefits of a settlement "f[ell] short of being evidence of collusion or wrongdoing." *Id.* at 823–24. That Court simply held it to be "one factor in the totality of the circumstances" in the good-faith determination. *Id.* at 824. This is undoubtedly correct.

Second, Northwestern argues that, because Wheeler had no claims against the settling defendants when the settlement was approved due to the purported expiration of the statute of limitations, the only purpose of the settlement could have been to block its contribution claims against Nutraquest. But as of the date Wheeler agreed to settle with Nutraquest pending Court approval, he could have reasserted his claims against the settling defendants. He did not, perhaps simply motivated to dispense with the claims for good. Conjecture aside, the Court found "nothing in the record to suggest that the settlement was motivated by a desire to frustrate Northwestern's contribution claims." *In re Nutraquest*, mem. op. at 12. Moreover, avoiding contribution is not *per se* evidence of bad faith, *Alvarez*, 617 N.E.2d at 824, so long as the settlement is not "grossly disproportionate" to the settling defendant's relative liability, *Associated Aviation Underwriters, Inc. v. Aon Corp.*, 800 N.E.2d 424, 435 (Ill. App. Ct. 2003). Here we have already determined that the settlement was not grossly disproportionate

21

to Wheeler's claims against Nutraquest.[5]

In this context, finding good faith appears the only sensible course under the circumstances presented. The only abuse of discretion would be to conclude otherwise.

## V. Conclusion

The District Court properly applied the correct factors in deciding whether to approve this settlement. It also did not abuse its discretion in approving the settlement under federal bankruptcy law or under Illinois law.

---

[5] Northwestern argues that, because the District Court did not apportion the settlement amount between Wheeler's wrongful-death and survival claims, the Court abused its discretion. The requirement that courts consider the settlement allocation within the good-faith determination applies when the settlement agreement itself allocates the settlement amount among the various claims. *Readel v. Towne*, 706 N.E.2d 99, 101–02 (Ill. App. Ct. 1999). In this case, the settlement agreement made no such allocation. Illinois law does not require settlements to apportion the settlement amount; in that context, the burden simply shifts to the plaintiff to prove in a later proceeding which portion of the settlement should be set off against later awards. *Patton v. Carbondale Clinic, S.C.*, 641 N.E.2d 427, 433 (Ill. 1994).